[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION [1]
This is an appeal from a November 5, 1999, final decision by the defendant, Department of Public Health ("DPH"), ordering that a finding of resident abuse be placed on the Connecticut Nurse Aide Registry under the name of the plaintiff, Yvonne Locke. The appeal is taken pursuant to General Statutes §§ 20-102cc and 4-183 of the Uniform Administrative Procedure Act.
On July 2, 1999, DPH issued a notice of complaint against the plaintiff alleging that the plaintiff's conduct as a nurse's aide at Maple View Manor in Rocky Hill, Connecticut, constituted resident patient abuse in violation of state and federal law.[2] (Return of Record ("ROR"), Volume I, Notice of Complaint, pp. 13-15.) On September 17, 1999, pursuant to the plaintiff's request, an administrative hearing was held.
The findings of fact made by the hearing officer for DPH may be summarized as follows:
1. The plaintiff is listed on the registry maintained by DPH and was at all times employed by Maple View, a convalescent nursing home.
2. During 1977, a patient, hereinafter referred to as "W. J.", at Maple View needed assistance from a nurse's aide. While providing care for W. J., the plaintiff inappropriately touched W.J. "s genitals and made comments about his lack of sexual prowess. She also commented on his defecating in his bed.
3. W. J. became extremely angry with these comments, raised his fist to the plaintiff, and his face turned red. This was uncommon conduct for W. J., who was known to be a passive person. When W. J. was obviously angry, the plaintiff laughed at him. The plaintiff's statements and conduct resulted in W. J.'s sustaining mental anguish.
4. During 1997, a male patient, hereinafter referred to as "R.P.", at Maple View required the assistance of a nurse's aide and was treated roughly by the plaintiff. R.P. had smeared feces on himself and his bedding. The plaintiff poured cold water on R.P.'s groin and washed both his groin area and his face in this water.
5. R.P. yelled out when the plaintiff poured the water on his groin and was shocked. The plaintiff's conduct resulted in R.P.'s sustaining pain and mental anguish. CT Page 471
6. During 1997, a male patient, hereinafter known as "L.D.", at Maple View required the assistance of a nurse's aide and was inappropriately touched on his genitals by the plaintiff. At various times, she jiggled the genitals, tapped them with her finger, made comments about his sexual prowess, and pressed her breasts and body towards his face. She also mimicked the way he called out "mommy, mommy" in his sleep by mockingly yelling "mommy, mommy" within hearing distance of L.D. on numerous occasions.
7. L.D. became very angry after the plaintiff commented on his sexual abilities. A different nurse's aide later discovered L.D. crying and spent time with him attempting to calm him down. L.D. was dying from cancer. The plaintiff's conduct and statements resulted in L.D.'s sustaining mental anguish.
8. During 1997, one R. A., a male patient at Maple View requiring the assistance of a nurse's aide, had repeated interaction with the plaintiff. Under circumstances where she was not rendering care to R. A., the plaintiff exposed R. A.'s genitals and made comments about his sexual prowess.
9. The plaintiff's conduct and statements resulted in R. A.'s sustaining mental anguish.
10. During 1997, one N.T., a female resident of Maple View who required the assistance of a nurse's aide, was patted on the genital area, which was exposed, and a comment was made about her genitals. The plaintiff was not in the process of care for N.T. at that point.
11. N.T., who was typically a pleasant individual, reacted immediately and began yelling. The plaintiff's conduct and lewd remark resulted in N.T's sustaining mental anguish.
12. The plaintiff's testimony was not credible when she denied the allegations contained in the charges.
(ROR, Volume I, Final Memorandum of Decision, pp. 4-6.)
Based on these findings of fact, the hearing officer concluded that a finding of resident abuse be placed on the Connecticut Nurse Aide Registry under the plaintiff's name. (ROR, Volume I, Final Memorandum of Decision, p. 8.) The effect of this order by DPH is that the plaintiff is prohibited from being employed by chronic and convalescent nursing homes and rest homes in Connecticut. 42 C.F.R. § 483.13(c)(1)(ii)(B). This appeal to Superior Court followed.[3]
CT Page 472
"We begin our analysis by noting that our review of an agency's factual determination is constrained by the [UAPA]. Specifically, General Statutes § 4-183(j)(5) mandates that a court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are. . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. . . .We have interpreted the standard of review set forth in the act as limiting our review such that [w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . .An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . .The credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency, and, if there is evidence . . . which reasonably supports the decision of the commissioner, we cannot disturb the conclusion reached by him. . . ." (Citations omitted; internal quotation marks omitted.) Salmon v. Dept. of Public Health Addiction Services, 58 Conn. App. 642, 660-61, cert. granted on other grounds, 254 Conn. 926 (2000).[4]
As to each of the residents, the plaintiff denies that there was substantial evidence in the record to support the hearing officer's conclusions of abuse. She further claims that substantial evidence was lacking as to the adverse impact on these patients. The record does not support these contentions. As to patient W. J., DPH produced an eye witness from the staff of the nursing home to the genital-touching and comment incident and to the effect it had on W. J. (ROR, Volume II, Transcript of September 17, 1999 Hearing, p. 30; ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), p. 31.) Another staff witness also testified to the vulgar comment about W. J.'s soiling his bed and also his reaction. (ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), p. 62.) The plaintiff admitted making this comment. (ROR, Volume II, Transcript of September 17, 1999 Hearing, p. 114.)
As to the patient R.P., a staff witness testified to the incident involving the plaintiff pouring cold water on R.P.'s genital area and the clean-up using this water. (ROR, Volume II, Transcript of September 17, CT Page 473 1999 Hearing, pp. 33, 35, 46; ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), pp. 34, 38, 48.) In addition, the witness testified about R.P.'s yelling out when the plaintiff poured the water on him, thereby establishing the impact on the patient. (ROR, Volume II, Transcript of September 17, 1999 Hearing, pp. 33, 35, 45; ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), pp. 45, 48.)
As to the patient N.T., a witness testified that she saw the plaintiff pat the patient on the genital area and make a sexually-charged comment. She testified that she could see the genital area of N.T. and at the time of the incident, no care was yet being given to the resident. (ROR, Volume II, Transcript of September 17, 1999 Hearing, pp. 60; ROR, Transcript of September 17, 1999 Hearing (Under Seal), p. 59.) The witness testified that N.T. began yelling when the plaintiff was confronting her. (ROR, Volume II, Transcript of September 17, 1999 Hearing, p. 60.)
As to the patient L.D., his wife testified about the genital-handling incident and associated comments, the demeanor of the plaintiff as she pushed her "bosom" into the face of her husband, and the times she would mock her husband. (ROR, Volume II, Transcript of September 17, 1999 Hearing, pp. 136-40, 143-44, 147-49, 152; ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), pp. 64-65, 141, 150.) The wife also testified that the experience caused L.D. to become angry and depressed. (ROR, Volume II, Transcript of September 17, 1999 Hearing, pp. 140, 143-44, 146-47; ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), p. 65.)
Finally, as to R. A., he personally testified on his own complaint of abuse. He testified that on at least six occasions, the plaintiff "made fun" of his genitals. (ROR, Volume II, Transcript of September 17, 1999 Hearing, p. 14.) He testified that he was embarrassed and humiliated, especially one time when other nurse's aides were present. (ROR, Volume II, Transcript of September 17, 1999 Hearing, pp. 15, 19.)
The plaintiff contends that the DPH's evidence is without verification or documentation in the nursing home's files. To some extent this is understandable, as one witness, a fellow employee of the plaintiff, testified that she did not want to get anyone in trouble. (ROR, Volume II, Transcript of September 17, 1999 Hearing, p. 36; ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), p. 37.) R. A. testified that he was too embarrassed to report the incidents involving him. (ROR, Volume II, Transcript of September 17, 1999 Hearing (Under Seal), p. 24.)
The hearing officer was not legally obliged to seek out additional CT Page 474 documentation in the records of the nursing home. As indicated above, she had the role of assessing the credibility of witnesses appearing before the agency and giving weight to such evidence. The court must be "highly deferential" to her conclusions. As stated by the Appellate Court: "The hearing officer made numerous findings concerning [DPH witnesses'] testimony. Among those findings were that [the witnesses were] not fabricating [their] side of the incident, that [they] had no motive to make trouble for the plaintiff, and that [they were] consistent with [their] statements on both direct and cross-examinations. Most importantly, the hearing officer specifically found that [the witnesses'] testimony was more credible than the plaintiff's. . . .Thus, we conclude . . . that there was substantial evidence in the record to support the department's conclusions." Salmon v. Dept. of Public Health AddictionServices, supra, 58 Conn. App. 662.
This court follows the Salmon analysis and finds that there is substantial evidence of record to support the hearing officer's conclusions.
The conclusions of the hearing officer on credibility are not affected by the delay of two years between the incidents and the DPH charges. The test to determine whether a delay between an incident and the bringing of charges by DPH constitutes unfairness to the plaintiff; Pet v. Departmentof Health Services, 228 Conn. 651, 683 (1994); Grimes v. ConservationCommission, 243 Conn. 266, 273 (1997); is whether or not the plaintiff has been prejudiced. The plaintiff must show that she was restricted in preparing her defense and assembling her evidence. There is nothing in the record to establish that the plaintiff was not aware of the charges or was unable to testify about the alleged incidents or was prejudiced in preparing a defense due to the time taken by DPH in bringing the charges.
Finally, the plaintiff relies on Secondino v. New Haven Gas Co.[5],147 Conn. 672 (1960) for the proposition that an adverse inference should have drawn because DPH failed to present corroborating witnesses, such as more nurses or nurse's aides that witnessed the incidents than those who testified. First, Secondino has less applicability to administrative hearings as these proceedings are not bound by the strict evidence code of the civil courts. Hernandez v. Commissioner of the Dept. of PublicHealth, Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 564623 (April 8, 1998, DiPentima, J.).
Even if Secondino were to apply here, "[t]he failure of a party to call as a witness a person who is available to both parties and who does not stand in such a relationship to the party in question or to the issues that that party would naturally be expected to produce him if his testimony was favorable affords no basis for an unfavorable inference. . CT Page 475 . ." (Citations omitted.) Secondino v. New Haven Gas Co., supra,147 Conn. 676. The plaintiff has failed to demonstrate that any additional witnesses stood in such a relationship to DPH that it naturally would be expected to produce them. DPH had produced several eye witnesses to the plaintiff's behavior, and it was not their duty to search out additional persons at the nursing home who might have had cumulative evidence.
The plaintiff's appeal is therefore dismissed.
Henry S. Cohn, Judge